UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL R. SCHMIDT, *et al.*, | : | Case No. 1:13-cv-932 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| THE TRAVELERS INDEMNITY | : | |
| COMPANY OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

## ORDER GRANTING DEFENDANT'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT (Doc. 8) AND
## DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## (Doc. 9)

This civil action is before the Court on the parties' cross motions for partial

summary judgment (Docs. 8, 9) and responsive memoranda (Docs. 14, 15, 16, 17).

## I.     BACKGROUND FACTS

Plaintiffs Michael R. Schmidt ("Schmidt") and Cohen, Todd, Kite & Stanford

LLC ("CTKS") allege that Defendant Travelers Indemnity Company of America

("Travelers") breached the parties' contract and acted in bad faith when it refused to

indemnify Plaintiff CTKS pursuant to an insurance policy.  (*See* Doc. 1 at ¶¶ 34-39,

42-47).  In addition to damages and attorney's fees, Plaintiffs seek a declaration that the

loss is a covered loss under the policy and, therefore, Defendant owes Plaintiff CTKS a

duty of indemnification.  (*See id.* at ¶¶ 40-41).

Plaintiffs and Defendant filed cross-motions for partial summary judgment.[1] Plaintiffs argue that Defendant breached its obligations under the insurance policy then in effect (the "Policy") by refusing to pay Plaintiff CTKS for its covered losses.  Defendant argues that the Policy does not cover the loss sustained and, in any event, the loss is specifically excluded.[2]

## II.  UNDISPUTED FACTS

### A.  In Support of Plaintiffs' Motion for Partial Summary Judgment[3]

1. CTKS paid insurance premiums to Travelers in exchange for which Travelers provided business owners insurance coverage to CTKS under Policy No. 1-680-9A246743-TIA-11 ("Policy").  (Doc. 9-1 at 2, ¶ 1; Doc. 1-3 at 2-3).

2. As a result of CTKS's payment of the insurance premiums when due, the Policy was in effect from December 14, 2011 through December 14, 2012.  (Doc. 9-1 at 2-3, ¶ 2; Doc. 1-3 at 2-3).

3. The Policy contains a "Computer Fraud" provision stating that insurance may be extended "to apply to loss of or damage to Business Personal Property resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the building at the described premises or 'banking premises': (a) To a person outside those premises; or (b) To a place outside those premises." (Doc. 9-1 at 6, ¶ 13; *see also* Doc. 1-4 at 26).

4. On February 21, 2012, while the Policy was in effect, Schmidt received an email on his CTKS computer requesting legal representation from a person purporting to be Erick Carpenter, supposedly a resident of Japan.  (Doc. 9-1 at 4, 6, ¶¶ 3, 14; *see also* at Doc. 9-2 at ¶¶ 2-3, 28).

---

[1] The Court bifurcated the coverage and bad faith issues.  (*See* March 12, 2014 Minute Entry and Notation Order).  Accordingly, only the coverage issue is now before the Court.  Plaintiffs seek summary judgment as to their breach of contract claim (Count One); Defendant seeks summary judgment as to Plaintiffs' breach of contract claim (Count One) and declaratory judgment claim (Count Two).  (*See* Docs. 1, 8, 9).

[2] The Court addresses whether Plaintiff CTKS suffered a single loss or several distinct losses in Part IV.A, *infra*.

[3] *See* Docs. 12, 14-1.

5. On February 27, 2012, Plaintiffs and the person purporting to be Erick Carpenter entered into a retention agreement via electronic mail, whereby Plaintiffs undertook to represent the purported Erick Carpenter with respect to his claims against North American Iron and Steel Company ("North American"), in exchange for a 25 percent contingent fee. (Doc. 9-2 at ¶¶ 6, 28; Doc. 9-1 at 4, 7, ¶¶ 4, 15; *see also* Doc. 1-1 at 2-5).

6. The person purporting to be Erick Carpenter then provided Schmidt with additional details regarding his purported claim against North American via electronic mail. (Doc. 9-2 at ¶¶ 5, 28; *see also* Doc. 9-1 at 7, ¶ 16).

7. After entering into the retention agreement, Schmidt drafted a demand letter to North American and forwarded the draft to the person purporting to be Erick Carpenter through the use of a computer. (Doc. 9-2 at ¶¶ 7-8, 28; *see also* Doc. 9-1 at 7, ¶¶ 17-18).

8. In response to Schmidt's email, the purported Erick Carpenter sent his approval of the draft letter to Schmidt via electronic mail. (Doc. 9-2 at ¶¶ 9, 28; *see also* Doc. 9-1 at 8, ¶ 19).

9. On February 29, 2012, Schmidt sent a letter to North American via electronic mail using his CTKS computer. (Doc. 9-2 at ¶¶ 10, 28; *see also* Doc. 9-1 at 4, 8, ¶¶ 4, 20).

10. The letter, which was sent to an email address that the purported Erick Carpenter had provided, demanded payment of $378,000 to Schmidt as counsel for Carpenter. (Doc. 9-2 at ¶¶ 10, 28; *see also* Doc. 9-1 at 4, 8, ¶¶ 4, 20).

11. Also on February 29, 2012, a person purporting to be Edgar Marshall, on behalf of North American, responded to Schmidt's demand letter, also via email. (Doc. 9-2 at ¶¶ 11, 28; *see also* Doc. 9-1 at 8, ¶ 21).

12. In the email to Schmidt, the purported Edgar Marshall offered that North American would pay the balance of the outstanding $378,000 supposedly owed to Erick Carpenter and would do so in two separate $189,000 payments. (Doc. 9-2 at ¶¶ 12, 28).

13. Schmidt conveyed that offer to the person purporting to Erick Carpenter via electronic mail using his computer. (Doc. 9-2 at ¶¶ 13, 28; *see also* Doc. 9-1 at 8, ¶ 22).

14. Via electronic mail, the person purporting to be Erick Carpenter sent his authorization to Schmidt to accept the offer made by Edgar Marshall.  (Doc. 9-1 at 9, ¶ 23; *see also* Doc. 9-2 at ¶¶ 14, 28).

15. Via electronic mail and through the use of his computer, Schmidt conveyed to the person purporting to be Edgar Marshall that Erick Carpenter had accepted Marshall's offer.  (Doc. 9-1 at 9, ¶ 24; *see also* Doc. 9-2 at ¶¶ 15, 28).

16. Following these communications, all of which took place via electronic mail, CTKS received what purported to be a cashier's check in the amount of $189,000 from North American on March 6, 2012.  (Doc. 9-1 at 4-5, ¶ 6; *see also* Doc. 9-2 at ¶¶ 16, 28).

17. The person purporting to be Erick Carpenter, via electronic mail, transmitted instructions to Schmidt for wiring $141,750 ($189,000 minus CTKS's 25 percent contingent fee) to Carpenter's account in Japan.  (Doc. 9-1 at 9, ¶ 25; *see also* Doc. 9-2 at ¶¶ 18, 28).

18. Plaintiffs deposited the purported $189,000 cashier's check into CTKS's IOLTA account.  (Doc. 9-2 at ¶ 17).

19. On March 7, 2012, CTKS wired $141,750 to the Japanese bank account of the person purporting to be Erick Carpenter, as instructed.  (*Id.* at ¶ 19).

20. Only after wiring the amount of $141,750 did Plaintiffs learn from their own bank that the cashier's check they received from North American and then deposited was fraudulent.  (*Id.* at ¶ 20).

21. A second cashier's check for $189,000 from North American, which Plaintiffs received on March 12, 2012, also was fraudulent.  (*Id.*)

22. On March 14, 2012, more than a week after Plaintiffs wired the amount of $141,750 to the account of the person purporting to be Erick Carpenter and learned that the purported cashier's checks from North American were fraudulent, the person purporting to be Erick Carpenter, via electronic mail, separately informed Schmidt that he would send a check for $141,750 to Schmidt.  (Doc. 9-1 at 10, ¶ 26; *see also* Doc. 9-2 at ¶¶ 21, 28).

23. Plaintiffs have received no money back from the person or persons purporting to be Erick Carpenter or Edgar Marshall.  (Doc. 9-2 at ¶ 22).

24. CTKS, through its Cincinnati insurance agent, Neace Lukens, filed a timely claim for its losses with Travelers in the amount of $141,750, asserting that its losses should be covered under the Policy. (Doc. 9-1 at 5, ¶ 8; *see also* Doc. 9-2 at ¶¶ 24, 26).

25. CTKS later submitted to Travelers additional information supporting its claim for insurance coverage. Travelers denied CTKS's claim for coverage in letters dated April 17, 2012 and May 2, 2012. (Doc. 9-1 at 5, ¶ 10; *see also* Doc. 9-2 at ¶ 27).

26. In a January 7, 2013 letter, Travelers again denied CTKS's claim for insurance coverage under the Policy. (Doc. 9-1 at 5, ¶ 9; *see also* Doc. 9-2 at ¶ 27).

**B.     In Support of Defendant's Motion for Partial Summary Judgment**[4]

1. Plaintiffs Michael R. Schmidt ("Schmidt") and Cohen, Todd, Kite & Stanford LLC ("CTKS") seek indemnification from Defendant Travelers Indemnity Company of America ("Travelers") for the loss CTKS sustained when Schmidt, acting on behalf of CTKS, wired $141,750 from CTKS's IOLTA (trust) account at Chase Bank to Erick Carpenter's bank account in Japan ("$141,750 Loss"). (Doc. 1 at ¶¶ 21-27, 33).[5]

2. Schmidt, a member of CTKS licensed to practice law in the State of Ohio, agreed on behalf of CTKS to represent Erick Carpenter relating to a purported breach of a settlement agreement between Carpenter and his former employer, North American Iron and Steel Company ("North American"). (*Id.* at ¶¶ 2, 9, 12).

3. Schmidt drafted and emailed a letter to North American demanding that it pay the balance owed on the purported settlement agreement ($378,000), and a person purportedly acting on behalf of North America (Edgar Marshall) offered to make a payment of $378,000 to Carpenter in two installments of $189,000. (*Id.* at ¶¶ 13, 16, 17).

4. Schmidt emailed Erick Carpenter's acceptance of Edgar Marshall's offer, and on March 6, 2012 Schmidt received what appeared to be a cashier's check in the amount of $189,000 from North American ("North American Check"). (*Id.* at ¶¶ 20, 21).

---

[4] *See* Docs. 13, 15-1.

[5] Plaintiffs admit that this paragraph describes one of three distinct covered losses claimed by Plaintiffs, the other two being losses due to "not enjoying the benefits of the fraudulent cashier's checks and the failure of the purported Erick Carpenter to pay $141,750 to plaintiffs as promised." (*See* Doc. 9 at 17; Doc. 15 at 2, 19-21).

5. Schmidt deposited the North American Check into CTKS's IOLTA (trust) account at Chase Bank, deducted CTKS's twenty-five percent contingent fee, and wired the balance of $141,750 to Erick Carpenter's bank account in Japan, account no. 1017380 ("Wire Transfer"). (*Id.* at ¶¶ 22, 23).

6. After the Wire Transfer was complete, Chase Bank notified CTKS, and Schmidt learned, that the North American Check had been dishonored as fraudulent. (*Id.* at ¶ 24).

7. After Schmidt learned that the North American Check had been dishonored, Schmidt left Edgar Marshall telephone messages notifying North American that the North American Check was dishonored, and sent Erick Carpenter an email demanding that he return the $141,750 that Schmidt wired to Erick Carpenter's bank account. (*Id.* at ¶¶ 25, 26).

8. Edgar Marshall did not respond to Schmidt's telephone messages, and Erick Carpenter failed to return any of the $141,750 that Schmidt wired to Erick Carpenter's bank account. (*Id.* at ¶¶ 25-27).

9. Travelers issued policy number I-680-9A246743-TIA-11 ("Policy") to CTKS, an Ohio insured, in Ohio. (*Id.* at ¶ 5).

10. The Policy contains Common Policy Declarations, a Businessowners Property Coverage Special Form, and a Lawyers Endorsement. (*See* Doc. 8-2; *see also* Doc. 8-3 at 29-169). [6]

11. In the introductory paragraphs of the Businessowners Property Coverage Special Form, it is stated that: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations [CTKS]. The words 'we', 'us' and 'our' refer to the Company providing this insurance [Travelers]." (Doc. 8-2 at 2).

12. Paragraph A. of the "COVERAGE" of the Policy's Businessowners Property Coverage Special Form states, "We [Travelers] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss." (*Id.*)

13. "Covered Property" is stated to be "the type of property described in this Paragraph A.1., and limited in Paragraph A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property." (*Id.*) [7]

---

[6] The titles of these forms are capitalized throughout the Policy, and the numbers and letters denoting separate paragraphs, and those paragraph titles, appear in bold text. For ease of reading, the Court will not employ capital letters when referring to the Policy forms (unless part of a quotation) and will not employ bold text when referring to paragraphs within the Policy (even when part of a quotation).

14. The "described premises" are CTKS's law offices at 250 E. 5th Street, Suite 1200, Cincinnati, Ohio.  (*Id.* at 1).

15. The $141,750 Loss was to CTKS's IOLTA (trust) account. (Doc. 1 at ¶ 23).[8]

16. Paragraph A. of the "COVERAGE" of the Businessowners Property Coverage Special Form requires "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss".  (Doc. 8-2 at 2).[9]

17. "Covered Causes of Loss" is "DIRECT PHYSICAL LOSS unless the loss is . . . b. Excluded in Paragraph B., Exclusions."  (*Id.* at 4-5).[10]

18. The Lawyers Endorsement of the Policy "modifies insurance provided under the . . . BUSINESSOWNERS PROPERTY COVERAGE SPECIAL FORM". (*Id.* at 42).

19. The following Coverage Extension is added by the Lawyers Endorsement:

   b. Computer Fraud

   (1) When a Limit is shown in the Declarations for Business Personal Property at the described premises, you [CTKS] may extend that insurance to apply to loss of or damage to Business Personal Property resulting directly from the use of any computer to fraudulently cause a transfer of the property from the inside the building at the described premises or "banking premises":

   (a) To a person outside those premises; or

---

[7] Plaintiffs admit that this quote is accurate but note that it does not reflect the entire description of "Covered Property" contained in the Policy.

[8] Plaintiffs admit that $141,750 was wired from CTKS's IOLTA (trust) account and, thus, lost, but deny this was CTKS's only loss of $141,750.  *See supra* note 5 and accompanying text.

[9] Plaintiffs admit that the portion of this paragraph in quotation marks is a verbatim quote from "Paragraph A" but note that it does not reflect the entirety of the requirements for coverage under the Policy.

[10] Plaintiffs admit that the portion of this paragraph in quotation marks is a verbatim quote from pages 3-4 of 39 of the Policy but note that it does not reflect the entirety of the requirements for coverage of losses under the Policy.

(b) To a place outside those premises.

(2) Paragraph B.2.o. does not apply to this Coverage Extension.

(3) The most we will pay under this Coverage Extension in any one occurrence is $10,000, regardless of the number of premises involved.

*Id.* at 45).

20. Subsection 2. of Paragraph B., Exclusions, states that: "2. We [Travelers] will not pay for loss or damage caused by or resulting from any of the following: … i. Voluntary parting with any property by you [CTKS] or anyone else to whom you have entrusted the property", or "l. Default on any credit sale, loan, or similar transaction." (*Id.* at 25-26).[11]

21. The Lawyers Endorsement does not provide that these exclusions, Paragraphs B.2.i. and B.2.l., are inapplicable to the Computer Fraud Coverage Extension. (*Id.*)[12]

## III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be

---

[11] Plaintiffs admit that the portion of this paragraph in quotation marks is a verbatim quote of the language found on page 25 of 39 of the Policy (except for the inserted word "or") but note that does not reflect the entirety of the language found on that or the previous page of the Policy.

[12] Assuming that this paragraph refers to the "exclusions" in Paragraph 20, Plaintiffs admit this fact.

construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

Plaintiffs invoke three policy provisions in support of their motion for summary judgment on the coverage issue: (1) the Computer Fraud coverage extension; (2) the Business Personal Property provision; and (3) the Business Income and Extra Expense provision.[13] Defendant argues that these provisions do not cover the loss suffered by Plaintiff CTKS and, in any event, "voluntary parting" and "default" coverage exclusions apply.

The parties agree that Ohio law applies. (*See* Doc. 8-1 at 10-11).[14] Construing an insurance policy is a matter of law. *See Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 245-46, 374 N.E.2d 146 (1978). In interpreting an insurance contract, the Court gives effect to the intent of the parties to the agreement. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999) (citation

---

[13] The Court will employ these provision titles as shorthand to refer to the relevant policy language. The Business Personal Property and the Business Income and Extra Expense provisions are located in the Businessowners' Property Coverage Special Form. For relevant policy language, see Part IV.C, *infra*. The Computer Fraud coverage extension is located in the Lawyer's Endorsement. For relevant policy language, see Part II.B at ¶ 19, *supra*.

[14] While Plaintiffs do not explicitly state that Ohio law governs interpretation questions raised in these motions, they cite Ohio law for the breach of contract standard (*see* Doc. 9 at 18) and cite to Ohio law for contract interpretation principles in their memoranda (*see, e.g.*, Doc. 19 at 9). As Defendant notes, the Policy was issued by Defendant to Plaintiff CTKS, an Ohio insured, in Ohio.

omitted).  The Court gives words and phrases their ordinary meaning unless another meaning is apparent from the contents of the policy.  *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 219, 797 N.E.2d 1256 (2003) (citing *Alexander*, 53 Ohio St.2d at 241). The Court gives meaning to every paragraph, clause, phrase, and word.  *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (citing *Heifner v. Swaney,* 1992 WL 198120 (Ohio App. Aug. 27, 1992)).

If provisions are reasonably susceptible of more than one meaning, they "will be construed strictly against the insurer and liberally in favor of the insured."  *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380 (1988), syllabus.  However, provisions are to be strictly construed against the insurer only when they are ambiguous. *GenCorp, Inc. v. Am. Intern. Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999) (citing *University of Cincinnati v. Arkwright Mut. Ins. Co.,* 51 F.3d 1277, 1280 (6th Cir. 1995) (applying Ohio law)).  "[T]he general rule of liberal construction cannot be used to create an ambiguity where one does not exist.  If the terms of a policy are clear and unambiguous, a court must enforce the contract as written, giving words used in the contract their plain and ordinary meaning."  *Monticello Ins. Co. v. Hale*, 284 F.Supp.2d 898, 901 (S.D. Ohio 2003) (citations omitted).

"A liability insurer's obligation to its insured arises only if the claim falls within the scope of coverage."  *Cincinnati Indem. Co. v. Martin,* 85 Ohio St.3d 604, 605, 710 N.E.2d 677 (1999).  The party who seeks to recover under an insurance policy generally has the burden of demonstrating coverage under the policy and proving a loss.  *Chicago Title Ins. Co. v. Huntington Nat'l Bank,* 87 Ohio St.3d 270, 273, 719 N.E.2d 955 (1999)

(citing *Inland Rivers Service Corp. v. Hartford Fire Ins. Co.*, 66 Ohio St.2d 32, 418 N.E.2d 1381 (1981)).  However, the insurer bears the burden of proving that an exclusion applies.  *Cont'l Ins. Co. v. Louis Marx Co.,* 64 Ohio St.2d 399, 415 N.E.2d 315, 317 (1980).  Exclusionary language in insurance policies must be clear and exact.  *See Land v. Grange Mut. Cos.*, 45 Ohio St.3d 63, 65, 543 N.E.2d 448 (1989).  "'A general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof.'"  *King*, 35 Ohio St. 3d at 214.

### A.    Claimed Losses

Plaintiffs claim to have suffered three distinct covered losses, each of which must be analyzed separately: (1) loss because the cashier's checks they received from North American were fraudulent ("First Loss"); (2) loss because Plaintiffs wired $141,750 to the person purporting to be Erick Carpenter ("Second Loss"); and (3) loss because the person purporting to be Erick Carpenter failed to pay $141,750 to Plaintiffs as promised ("Third Loss").  Defendant argues that Plaintiffs suffered a single loss, which occurred when they wired $141,750 from Plaintiff CTKS's IOLTA account at Chase Bank to Erick Carpenter's bank account in Japan.  Defendant claims that Plaintiffs had not described their loss as "three distinct covered losses"  prior to filing their cross-motion for partial summary judgment and argues that, while every loss can be viewed from different perspectives, those different perspectives do not transform a single loss into multiple losses.

The Court finds that Plaintiffs' claimed losses are supported by the undisputed facts.[15]  Accordingly, and in the absence of any authority requiring the Court to construe Plaintiffs' claimed losses as a single loss, the Court will determine whether any of the three claimed losses were covered under the Policy.

### B.    Exclusions

Defendant claims that Plaintiffs' claimed losses are clearly and unambiguously excluded from coverage under the Policy.  Because the Court finds that the "voluntary parting" exclusion clearly and unambiguously excludes Plaintiffs' Second Loss, and thereby renders analysis of whether the Computer Fraud coverage extension applies to such a loss unnecessary, the Court will address the exclusions first.  The Businessowners Property Coverage Special Form states, in relevant part, as follows:

> B.    EXCLUSIONS
> …
> 2.    We will not pay for loss or damage caused by or resulting from any of the following:
> …
> i.    Voluntary parting with any property by you or anyone else to whom you have entrusted the property.
> …
> l.    Default on any credit sale, loan, or similar transaction.

(Doc. 8-2 at 23, 24-25).

---

[15] Regarding the First Loss, the cashier's checks Plaintiffs received from North American were fraudulent.  *See supra* Part II.A at ¶ 20, 21.  Regarding the Second Loss, Plaintiff CTKS wired $141,750 to the Japanese bank account of the person purporting to be Erick Carpenter.  *See supra* Part II.A at ¶ 19. Regarding the Third Loss, the person purporting to be Erick Carpenter informed Plaintiff Schmidt that he would send a check for $141,750, but Plaintiffs never received such a check.  *See supra* Part II.A at ¶ 22, 23.

### 1.    Voluntary Parting Exclusion

Courts that have considered exclusions similar to the instant "voluntary parting" exclusion have found that these exclusions are conspicuous, plain, and clear.  For example, in *Martin, Shudt, Wallace, DiLorenzo & Johnson v. Travelers Indem. Co. of Conn.*, No. 1:13-cv-0498, 2014 WL 460045 (N.D.N.Y. Feb. 5, 2014), the court considered facts similar to those in the instant case and dismissed the insured's claims based on similar "voluntary parting" language.[16]  There, the insured law firm sought coverage for a loss it incurred after wiring funds to a purported overseas client, having subsequently discovered that a cashier's check thought to represent a payment of funds owed to that client, which the insured had deposited into its trust account, was fraudulent. *Id.* at *1.

The court in *Martin* held that the "voluntary parting" exclusion applied, despite the fact that the insured was tricked into directing the wire transfer.  *Martin*, 2014 WL 460045, at *3 ("On its face, the Voluntary Parting Exclusion unambiguously encompasses Plaintiff's Loss.").  As the court explained: "[t]hat Plaintiff wired the money in reliance on misrepresentations or false pretenses does not alter the

---

[16] Under the policy in at issue in *Martin,* "Covered Causes of Loss include 'risks of direct physical loss,' but exclude 'loss or damage caused by or resulting from . . . [v]oluntary parting with any property by you or anyone else to whom you have entrusted the property.'"  *Martin,* 2014 WL 460045, at *1.

voluntariness of that parting."[17]  The court rejected the insured's argument that Travelers' "voluntary parting" exclusion was ambiguous and that the exclusion "could reasonably be interpreted to encompass only gifts, loans, or bailments of property." *Id*. at *4.[18]  The Court finds this decision in *Martin* to be highly persuasive here.

Plaintiffs argue that the presence of fraud vitiated their ability to voluntarily part with the funds wired.  In support of their contention, they cite to Ohio case law

---

[17] The court provided the following citation:

> *See, e.g., Morris James, LLP v. Cont'l Cas. Co.*, 928 F. Supp. 2d 816, 819, 823 (D. Del. 2013) (finding that where law firm transferred proceeds of forged check to thirdparty account on the instruction of purported client, the insured had "voluntarily part[ed]" with the funds despite being induced to do so by fraud); *PNS Jewelry, Inc. v. Penn-Am. Ins. Co.*, No. B212348, 2010 Cal. App. Unpub. LEXIS 1467, 2010 WL 685967, at *4 (Cal. Ct. App. Mar. 1, 2010) ("The word 'voluntary' applies to the insured's 'parting' with the property—i.e., when the insured purposely parts with the property without force. . . . Although the owner was tricked into doing so. . . , the owner physically and purposely handed over the property . . . ."); *LaPerla, Ltd. v. Peerless Ins. Co.*, 51 Conn. Supp. 241, 980 A.2d 971, 971-83 (Conn. Super. Ct. 2009) (holding that sale of jewelry to fraudster who presented bad check fell within exclusion for losses resulting from "[v]oluntary parting with any property by you or anyone entrusted with property if induced to do so by any fraudulent scheme, trick, device or false pretense"); *see also* Mem. at 6-7, 7 n.2 (collecting cases); *cf*. 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 19.7 (2d ed. 2013) ("[T]he crime of false pretenses requires that the defendant . . . obtain title to the victim's property. . . . Whether title to property delivered to the defendant passes to him usually depends upon whether the victim *intends* to transfer title to him . . . .").

*Martin*, 2014 WL 460045, at *3 (footnote omitted).

[18] The Court notes that the cases cited by the *Martin* court and by Defendant in its memoranda address provisions that specifically exclude voluntary partings induced by fraud or trick.  *See, e.g., Morris James, LLP v. Cont'l Cas. Co.*, 928 F. Supp. 2d 816; *PNS Jewelry, Inc.*, 2010 WL 685967.  However, as the court in *Martin* helpfully explains: "the Voluntary Parting Exclusion applies to *any* voluntary parting with property. Therefore, it is *broader* than exclusions with additional language limiting the exclusion to only voluntary partings induced by fraud, scheme, or trick." *Martin*, 2014 WL 460045, at *4 (emphasis in original).

establishing that a payment induced by fraud is not treated as a voluntary payment.[19]

However, these cases address only whether recovery may be had from the parties who

received such payments and not whether the payors voluntarily *parted with* the funds.[20]

Accordingly, based on the foregoing, the Court finds that Plaintiffs' Second Loss is

clearly excluded by the "voluntary parting" provision.[21]

---

[19] *See Cook v. Home Depot U.S.A., Inc.*, No. 2:06-cv-00571, 2007 WL 710220, at *9 (S.D. Ohio Mar. 6, 2007); *Scott v. Fairbanks Capital Corp.*, 284 F. Supp. 2d 880, 894 (S.D. Ohio 2003); *State ex rel. Dickman v. Defenbacher*, 151 Ohio St. 391, 395, 86 N.E.2d 5 (1949); *Vindicator Printing Co. v. State*, 68 Ohio St. 362, 370, 67 N.E. 733 (1903); *Nationwide Life Ins. Co. v. Myers*, 67 Ohio App.2d 98, 103, 425 N.E.2d 952 (1980); *see also* 70 C.J.S. Payment § 107 (2005) ("A voluntary payment, within the meaning of the rule that such a payment cannot be recovered, means a payment made by a person of his own motion, without compulsion; a payment made without a mistake of fact or fraud, duress, coercion, or extortion, on a demand which is not enforceable against the payor; and whether in a given case a payment is voluntary depends on the facts of the particular case, as indicating an intention on the part of the payor to waive his legal rights.").

[20] Plaintiffs also argue that, because Plaintiff Schmidt was required to promptly deliver the funds to his client, the purported Erick Carpenter, any voluntariness on Plaintiff Schmidt's part was eliminated. *See* Ohio Rule of Professional Conduct 1.15(d) ("Except as stated in this rule or otherwise permitted by law or by agreement with the client or a third person, a lawyer shall promptly deliver to the client or third person any funds or property that the client or third person is entitled to receive.) (emphasis omitted); *see also* 70 C.J.S. Payment § 107 (2005) ("A voluntary payment, within the meaning of the rule that such a payment cannot be recovered, means a payment made by a person of his own motion, without compulsion"); *United Nat'l Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914, 923 (6th Cir. 2002) (insurer was not a volunteer because the insured requested the insurer's payment, the insurer asserted a claim in contract and not in equity, and the insurer reserved its right to recoupment). Again, the treatise and case cited address whether a payor can recoup his payment, not whether the payor voluntarily *parted with* funds.

[21] In their reply memorandum, Plaintiffs argue that the Computer Fraud coverage extension covers Plaintiff's Second Loss, so, at worst, there is a conflict between the language of the Computer Fraud coverage extension and the "voluntary parting" exclusion, resulting in an ambiguity that must be resolved in Plaintiffs' favor. *See Morris James LLP*, 928 F.Supp. 2d 816. In *Morris James*, there was some question as to whether the relevant exclusionary language prevailed over the relevant coverage provision, and the court found that an ambiguity existed between the coverage afforded to losses that resulted from a forged instrument and the exclusion of losses resulting from a voluntary parting induced by fraud. Here, the Lawyers Endorsement (which contains the Computer Fraud provision) "modifies insurance provided under" the Businessowners Property Coverage Special Form. (Doc. 8-2 at 42, 45). The exclusionary language is found in that form, which explicitly states "[w]e will not pay for loss or damage caused by or resulting from . . . "[v]oluntary parting with any property by you or anyone else to whom you have entrusted the property." (*Id.* at 25-26). It is undisputed that that the Lawyers Endorsement does *not* provide that the "voluntary parting" exclusion is *inapplicable* to the Computer Fraud coverage extension.

### 2.   Default Exclusion

Defendant summarily concludes that the Court may hold that the "default" exclusion bars Plaintiff CTKS's recovery of the losses it incurred because North American failed to honor its checks (First Loss) and because Carpenter failed to return the $141,750.00 that Plaintiff Schmidt wired to him (Third Loss).

Defendant fails to explain in what respect North American's transmission of two fake cashier's checks or the purported Erick Carpenter's failure to pay $141,750 to Plaintiff Schmidt as promised constitute a "default" on a "credit sale, loan, or similar transaction." North American sent the two fake cashier's checks purportedly to fulfill a settlement agreement, not to pay off a loan that Plaintiff CTKS had made to North American. Further, the person purporting to be Carpenter reneged on a promise to send Plaintiff Schmidt $141,750, and there is no evidence that Plaintiffs made a loan or entered into a credit transaction with Carpenter requiring him to send $141,750 to the Plaintiffs.

In *Bank of Ann Arbor v. Everest Nat'l Ins. Co.*, 563 F. App'x. 473, 477-78 (6th Cir. 2014), the Sixth Circuit rejected a similar attempt by an insurer to deny coverage based on a "loan loss" provision invoked under similar circumstances. There, the plaintiff bank sought coverage after being defrauded by means of a fake wire transfer

---

*See supra* Part II.B at ¶ 21. Further, the Computer Fraud coverage extension affirmatively states that Paragraph B.2.o. (which contains an exclusion for the transfer of property to a person or place outside the described premises on the basis of unauthorized instructions) does *not* apply to the coverage extension. (Doc. 8-2 at 45). Logic suggests, then, that the other exclusions contained in the Businessowners Property Coverage Special Form *do* apply. For this reason, the Court declines to find the ambiguity Plaintiffs suggest.

request from an impostor posing as one of its customers. The bank lost almost $200,000

by wiring such amount from the true customer's account to that of the impostor in Korea.

The Sixth Circuit stated:

> Defendant contends that the loss Plaintiff suffered as a result of the fraudulent
> wire transfer request was from the extension of credit and is therefore excluded
> from coverage. However, the clear meaning of section 2(e) is that Defendant will
> not cover a loss resulting from a customer default on a loan or extension of credit
> made by Plaintiff. The loss in this case did not result from the nonpayment of a
> loan. It was a loss as a result of a fraudulent wire transfer request by someone
> other than the true customer.

Here, as in *Bank of Ann Arbor*, the losses for which the insurer invokes this

exclusion were the clear result of fraud, not a knowing decision on the insured's part to

extend credit to the defrauder.  For these reasons, the Court finds that the "default"

provision does *not* clearly exclude Plaintiffs' First or Third Losses.  Accordingly, it will

analyze the applicability of the coverage provisions invoked by Plaintiffs to these losses.

### C.    Policy Coverage

#### 1.    Business Personal Property Provision

Plaintiffs argue that their First Loss is covered under the Business Personal

Property provision.  The Businessowners Property Coverage Special Form provides, in

relevant part, as follows:

> A.    COVERAGE
> We will pay for direct physical loss of or damage to Covered Property at
> the premises described in the Declarations caused by or resulting from a
> Covered Cause of Loss.
>
> 1.    Covered Property
> Covered Property, as used in this Coverage Form, means the type of
> property described in this Paragraph A.1, and limited in Paragraph

>>A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property. …
>>
>>b.     Business Personal Property located in or on the buildings described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, including: …
>>
>>(4)     "Money" and "Securities". …
>
>4.     Covered Causes of Loss
>RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
>>a.     Limited in Paragraph A.5, Limitations; or
>>b.     Excluded in Paragraph B., Exclusions.

(Doc. 8-2 at 2, 4-5).[22]

Plaintiffs argue that the purported cashier's checks received from North American are "business personal property" because they fit within the Policy's definition of "securities." (*See* Doc. 8-2 at 39) (defining "'securities" as "all negotiable and non-negotiable instruments or contracts representing either 'money' or other property"). Plaintiffs explain that, like "securities," cashier's checks are negotiable instruments that represent money. Plaintiffs note that the terms "direct physical loss" and "covered cause of loss" are not explicitly defined and argue that, as a result, the provision is ambiguous.

The Court need not reach the question of whether the purported cashier's checks are "business personal property," and, thereby, "covered property," because there was no "direct physical loss of or damage to" the "checks." The Policy requires "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss" and thereafter states that "Covered Causes of Loss" are "DIRECT PHYSICAL LOSS unless the loss is" limited or excluded.

---

[22] The "described premises" are CTKS' law offices at 250 E. 5th Street, Suite 1200, Cincinnati, Ohio. (Doc. 8-2 at 1).

This is *not* an instance in which, for example, cashier's checks were destroyed and lost in a fire.[23]  Because Plaintiff has not presented evidence that the purported cashier's checks were physically lost or damaged, the Court finds that the First Loss is not covered loss under the Business Personal Property provision.

### 2. Business Income and Extra Expense Provision

Plaintiffs argue that their Third Loss, combined with the loss sustained by the dishonoring of the second cashier's check, is covered under the Business Income and Extra Expense provision of the Policy.  The Businessowners Property Coverage Special Form states, in relevant part, as follows:

    A.    COVERAGE
    …
    3.    Business Income and Extra Expense
        Business Income and Extra Expense is provided at the premises described in the Declarations when the Declarations show that you have coverage for Business Income and Extra Expense.
        a.    Business Income
            (1)    Business Income means:
                (a)    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred . . . and

---

[23] In *Florists' Mut. Ins. Co. v. Ludy Greenhouse Mfg. Corp.*, 521 F. Supp. 2d 661, 680 (S.D. Ohio 2007), the court found that a basic requirement for coverage under Florists' legal liability coverage form was that the insured sustain a loss as a result of "direct physical loss or damage".  The Court held that "funds deposited into a bank account do not have a 'physical' existence and, thus, are not susceptible to physical loss or damage." *Id.*  Plaintiffs try to distinguish *Florists' Mutual* on the grounds that, unlike funds deposited in a bank, a security in the form of a cashier's check has a physical existence and Plaintiffs' loss of the checks' benefits was directly related to the checks' physical nature (as fakes).  Put another way, Plaintiffs argue that because of the cashier's checks' physical characteristics, they were not treated as representations of money, as each purported to be.  While the loss may be attributable to the purported checks' physical characteristics, these "checks" and never had any value in the first instance and, in any event, were unchanged upon receipt by Plaintiffs.  The purported checks were not physically lost or damaged, as required by the plain language of the Policy.

             (b)      Continuing normal operating expenses incurred, including payroll.

     (2)      We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration."  The "suspension" must be caused by direct physical loss of or damage to property at the described premises.  The loss or damage must be caused by or result from a Covered Cause of Loss. …

**b.**      Extra Expense

     (1)      Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

     (2)      We will pay Extra Expense (other than the expense to repair or replace property) to:

             (a)      Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or

             (b)      Minimize the "suspension" of business if you cannot continue operations.

     (3)      We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph a. Business Income, above.

(Doc. 8-2 at 3-4).[24]  "Suspension" is defined as "[t]he partial or complete cessation of your [CTKS's] business activities" or "[t]hat a part or all of the described premises is rendered untenable."  (*Id.* at 40).  "Operations" is defined as "your [CTKS's] business activities occurring at the described premises and the tenantability of the described premises."  (*Id.* at 38).

Plaintiffs explain that, as a consequence of the wiring of the $141,750 to the purported Erick Carpenter's account in Japan and the dishonoring of the first cashier's check from North American, they were forced to incur the added expense of depositing $141,750 into Plaintiff CTKS's IOLTA account to restore the account's balance, pending the receipt of the check the purported Erick Carpenter promised to send and the second North American cashier's check.  Because Carpenter never sent his check and the second cashier's check was dishonored as fraudulent, Plaintiffs never recovered their deposit. Plaintiffs argue that, for a law firm, having an IOLTA account balance short by $141,750 constitutes a definite and significant interruption of the law firm's normal business activities.  Plaintiffs claim that their loss of $141,750 should be treated as an "Extra Expense" covered under the Policy.  They also argue that not enjoying the benefits of the check that Carpenter failed to send or of the second North American cashier's check should be treated as lost "Business Income," also covered under the Policy.

The Court cannot agree that the losses described are covered.  Plaintiffs suffered no loss of income due to the necessary "suspension" of their "operations" "*caused by a*

---

[24] The "described premises" are CTKS' law offices at 250 E. 5th Street, Suite 1200, Cincinnati, Ohio. (Doc. 8-2 at 1).

*direct physical loss of or damage to property at the described premises* [CTKS's law offices]".  (Doc 8-2 at 3-4) (emphasis supplied).  Further, the coverage provided for an insured's Extra Expense does not cover Plaintiffs' loss because the expenses incurred did not follow a "*direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.*"  (Doc 8-2 at 38) (emphasis added).[25]  Plaintiffs have not presented evidence that their business activities underwent a partial or complete cessation or that they lost business income or incurred extra expense as a result direct physical loss of or damage to property at the described premises.  The Court finds that Plaintiffs' Third Loss, combined with the loss sustained by the dishonoring of the second cashier's check, is not a covered loss.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs' claimed losses were not covered under the Policy.  Accordingly:

1.  Defendant's motion for partial summary judgment as to Plaintiffs' breach of contract and declaratory judgment claims (Doc. 8) is **GRANTED**;

2.  Plaintiffs' motion for partial summary judgment as to their breach of contract claim (Doc. 9) is **DENIED**.

**IT IS SO ORDERED**.


Date:  3/31/15                                            *s/ Timothy S. Black*
                                                         Timothy S. Black
                                                         United States District Judge

---

[25] *See* Part IV.C.1, *supra* (finding that Plaintiffs have not presented evidence of direct physical loss of or damage to property).